UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MUTHU NARAYANAN,

                              Plaintiff,                    <u>DECISION & ORDER</u>

                                                           15-CV-6165T

            v.

SUTHERLAND GLOBAL HOLDINGS INC.,

                              Defendant.

_____


## <u>PRELIMINARY STATEMENT</u>

        Pending before this Court is plaintiff Muthu Narayanan's motion to compel

defendant Sutherland Global Holdings, Inc. ("Sutherland") to produce documents as to which it

has asserted attorney-client privilege.[1]  (Docket # 45).  First, Narayanan seeks unredacted

preliminary and final versions of a report prepared for Sutherland by Freed Maxick CPAs, P.C.

("Freed Maxick"), a consulting and accounting firm.  The Freed Maxick report (the "Report")

contains legal advice from Rank Associates ("Rank"), an Indian-based law firm hired by

Sutherland.  Although Sutherland previously produced a copy of the Report, it redacted those

portions that reflected Rank's legal advice.  Second, Narayanan seeks emails and documents

from the period September 2013 through March 2014 between and among Rank, Sutherland, and

Michael Russo ("Russo"), a certified public accountant and Managing Director of Freed Maxick

(*see* Docket # 59-2 at ¶ 7).  Sutherland opposes the motion.  (Docket # 52).

_____

        [1] Narayanan originally moved to compel a third set of documents – email communications to an individual
named Ramarao, a non-attorney financial advisor not employed by Sutherland.  (Docket # 47 at 7-10).  Sutherland
has since agreed to produce those emails, acknowledging that they "do not contain privileged material."  (Docket
# 52 at 6 n.1).  Accordingly, those emails are not addressed herein.

Narayanan's principal argument is that Freed Maxick's involvement in communications between Rank and Sutherland waived the attorney-client privilege. Narayanan also maintains that Sutherland has waived any privilege attaching to the communications by placing the advice provided by Rank at issue in the litigation. Sutherland counters that the privilege remains intact because Russo was an agent of Sutherland whose involvement was "necessary and indispensable" to facilitate the attorney-client communications between Rank and Sutherland, or, alternatively, because Russo was the "functional equivalent" of a Sutherland employee. In addition, Sutherland maintains that it has not placed the communications at issue in this litigation.

On May 17, 2017, the Court heard oral argument on the motion. (Docket # 58). The Court thereafter granted Sutherland leave to supplement the record and provided Narayanan the opportunity to respond. (Docket # 56). The parties completed supplemental briefing on June 21, 2017, and the Court heard further argument on August 17, 2017. (Docket ## 59, 61, 64).

Based on the record before the Court and for the reasons explained more fully herein, I find that the communications at issue are not protected by any privilege.[2] Because I find that the communications at issue are not protected, I do not reach the issue of whether Sutherland waived any privilege by putting the subject matter of the withheld communications at issue in this litigation.

---

[2] As is discussed at length *infra*, I find that some of the communications simply did not constitute attorney-client communications, while other communications may have constituted attorney-client communications, but the inclusion of a third party in those communications, which this record does not demonstrate was necessary, waived any privilege attaching to those communications. Because the communications at issue encompass both types, the decision describes the communications as either "not privileged" or as "not protected," interchangeably.

## BACKGROUND

Narayanan commenced this diversity action on March 25, 2015, against Sutherland, asserting claims for breach of contract and unjust enrichment. (Docket # 1). Narayanan was a director of Sutherland and a director and/or officer of certain Sutherland overseas subsidiaries for more than ten years. (*Id.* at ¶ 8). In connection with his employment, Narayanan exercised his option to purchase company shares. (*Id.* at ¶ 19). In October 2014, the parties entered into two agreements pursuant to which Narayanan's shares were to be sold back to the company for approximately $2 million. (*Id.* at ¶¶ 4-7). Narayanan claims that despite performing his obligations under the agreements, he has not received the purchase price for his shares. (*Id.* at ¶ 7). According to Narayanan, he resigned from Sutherland in October 2014. (*Id.* at ¶ 29).

In its Answer, Sutherland asserts a defense of set-off, maintaining that Narayanan owes it a sum of money that "far exceeds, and will be a complete set-off to, the amount of money claimed by" Narayanan. (Docket # 12 at ¶¶ 59-86). Sutherland also asserts a counterclaim against Narayanan for breach of fiduciary duties, for which it claims damages of approximately $6 million. (*Id.* at ¶¶ 97-104). The district judge denied Narayanan's motion to dismiss the counterclaim and to strike the set-off defense. (Docket # 37).

Sutherland's set-off defense and counterclaim arise out of a series of transactions conducted by Narayanan in India. According to Sutherland, Narayanan was responsible for acquiring on behalf of Sutherland 26 contiguous acres of land in India. (Docket # 12 at ¶ 62). In connection with the expected acquisition, approximately $10 million was allocated to be paid to third parties in exchange for deeds and to register the land. (*Id.* at ¶ 63). Sutherland claims that despite acquiring only 11 non-contiguous acres, Narayanan advanced the funds to a third-party

land aggregator named Mr. S. Venkataramanan ("Ramanan"), primarily in exchange for promissory notes as opposed to deeds. (*Id.* at ¶¶ 64, 68). According to Sutherland, when it discovered that the funds had been advanced without the acquisition of the desired land, it concluded that it "had no choice but to work with [Narayanan] and Ramanan in an effort to recover the money." (*Id.* at ¶ 71). These efforts were ultimately unsuccessful. (*Id.*).

In August 2013, Sutherland, through its CEO Dilip Vellodi ("Vellodi"), engaged Freed Maxick to investigate the land acquisition project in India (the "Sutherland Land Acquisition") and detail its findings and recommendations in the Report. (Docket ## 47 at 7; 52 at 8). According to Freed Maxick's engagement letter with Sutherland, which was signed by Russo on behalf of Freed Maxick, the Report was expected to detail, among other things, its "findings related to the [Sutherland Land Acquisition] and [its] assessment of internal controls at [Sutherland]" and to "provide recommendations for improvements to internal controls at [Sutherland]." (Docket # 50-1). Vellodi has explained that Sutherland chose Russo to conduct the investigation because he had a long history with Sutherland and was a "trusted advisor" with "extensive knowledge about Sutherland." (Docket # 59-1 at ¶ 6). Between 1996 and 1998 Russo worked as Sutherland's Senior Vice President of Finance, and between July 2014 and July 2015 as its interim Chief Financial Officer. (Docket ## 52 at 8-9; 59-2 at ¶ 6). Since April 2014, Russo, who is not an attorney (Docket # 46-16 at 54-60), has also served as Sutherland's Legal Coordinator (Docket # 59-2 at ¶ 4). Sutherland maintains that Russo is responsible for coordinating Sutherland's defense and prosecution of this matter. (*Id.* at ¶ 6).

Also in August 2013, at Russo's recommendation, Sutherland retained Rank, an Indian-based law firm "specializ[ing] in real estate transactions." (*Id.* at ¶ 11). Russo testified at his deposition that he "was not qualified to fully complete the work that [Sutherland] [was]

looking for [him] to do without some competent legal advice" and he asked Sutherland to retain

a law firm. (Docket # 53-3 at 4). According to Vellodi, Rank was retained to provide "legal

advice related to certain aspects of the [Sutherland Land Acquisition]" and to advise "how best

to recoup the money that had allegedly been given to the land aggregator, Ramanan, but was now

unaccounted for with no land having been registered." (Docket # 59-1 at ¶ 8).

Russo and his Freed Maxick team began the investigation of the Sutherland Land

Acquisition in August 2013 and submitted the Report to Vellodi on or about September 12,

2013. (Docket # 50-2). The first paragraph of the Report states:

> We have provided the consulting services summarized below,
> which were agreed to by Sutherland Global Services, Inc. and
> subsidiaries (Sutherland) in an [engagement] letter dated August
> 20, 2013, solely to assist you in the evaluation of certain real estate
> transactions entered into by Sutherland Development Company
> Private Limited (SDC) and to provide a limited general review of
> internal controls at Sutherland's Indian operations. . . . Sutherland
> is also responsible for the design, implementation and maintenance
> of internal controls.

(*Id.*). Of the twelve-page single-spaced Report, less than one page was redacted; the redacted

section follows the paragraph that provides:

> During the course of the engagement, we had various discussions
> with S.C. Raghuram from Rank Associates, a law firm in India that
> was retained by the company to advise on this matter. During
> these discussions, Mr. Raghuram provided the following advice.
> You should consider and seek further advice as necessary.

(*Id.*). Following the redacted section, the Report introduces a new section, entitled, "Limited

Review of Internal Controls Over Capital Expenditures." (*Id.*).

Russo admits that during and following his investigation, he "spoke to [Rank] on

various occasions in order to provide, and explain, information uncovered during the

investigation and how it was impacting Sutherland Global[,] includ[ing] but . . . not limited to,

the information contained in [the Report]."  (Docket # 59-2 at ¶ 12).  Rank partner S.C.

Raghuram ("Raghuram") was the primary participant in those conversations, as evidenced from

Sutherland's privilege logs submitted in support of this motion.  (*See generally* Docket # 50-7).

Based on this Court's review, 26 entries on the privilege logs identify

communications during the September 2013 to March 2014 period in which Russo was a

participant.[3]  The earliest communications between Rank, Sutherland, and Russo are dated

September 12, 2013, and were from Raghuram to Russo and Vellodi.  (Docket # 50-7 at 2, items

1, 3, 5).  These communications relate to "orig[inal] findings by [F]reed [Maxick] re [sdc]" and

reflect "[l]egal advice regarding the land acquisition deal."  (*Id.*).  Raghuram also sent emails and

documents to Russo and Vellodi in September 2013 relating to either an "SDC Comparison" (*id.*

at 5-6, items 7, 9, 10, 11, 16, 17), or an "India report draft" (*id.* at 6-8, items 12, 13, 14, 18, 20,

22, 23, 24, 28).  According to Sutherland, all of these emails and documents reflect "[a]ttorney

client communication[s] regarding [the] investigation into [the] land transaction."  (*Id.*).

Communications between Rank, Russo, and Sutherland continued in November

and December 2013.  From November 13, 2013 to November 19, 2013, Raghuram and Russo

exchanged emails regarding a "meeting," which reflected "[a]ttorney client communication[s]

regarding [the] investigation into land transactions."  (*Id.* at 5, 8, items 5, 6, 29).  Also, on

November 13, 2013, Russo sent himself a spreadsheet, with no attorneys copied therein; the log

describes the communication as reflecting "[a]ttorney client communication[s] regarding [the]

land transaction and strategy for addressing."  (*Id.* at 8, item 32).  On November 29, 2013,

---

[3]  These entries consist of items 1, 2, 3, and 5 on Sutherland's Privilege and Redaction Log, and items 3, 4,
5, 6, 7, 9, 10, 11, 12, 13, 14, 16, 17, 18, 20, 22, 23, 24, 28, 29, 32, and 33 on Sutherland's Supplemental Privilege
and Redaction Log.  (Docket # 50-7).  The Court notes that these privilege logs were submitted in a Delaware state
court proceeding between the same parties.  (Docket # 46 at ¶ 31).  Narayanan has twice confirmed – first in his
memorandum of law (Docket # 47 at 9) and second at the August 17, 2017, oral argument (Docket # 64) – that the
documents he seeks to compel Sutherland to produce are those identified in the logs.

Raghuram sent emails to Russo, Vellodi, and K.S. Kumar ("Kumar"), Chief Commercial Officer of Sutherland in India (Docket # 58 at 9), regarding the "[s]ale of KRV land to Varun Manian" and reflecting "[a]ttorney client communication regarding [the] sale of certain land" (Docket # 50-7 at 5, 8, items 4, 33), as well as an "update" email reflecting "[l]egal advice regarding the land acquisition deal" (*id.* at 2, item 2). Finally, on December 2, 2013, Kumar sent an email to Rank and Russo "concerning legal advice and [the] scope of work to be conducted by lawyers in connection with [the] land transaction." (*Id.* at 5, item 3).

## DISCUSSION

Motions to compel are "entrusted to the sound discretion of the district court," *United States v. Sanders*, 211 F.3d 711, 720 (2d Cir.), *cert. denied*, 531 U.S. 1015 (2000), and "[a] trial court enjoys wide discretion in its handling of pre-trial discovery," *In re Finch, Inc.*, 330 F.3d 104, 108 (2d Cir. 2003) (citations and quotation marks omitted). Rule 26 of the Federal Rules of Civil Procedure allows parties to obtain "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). The current dispute turns on whether the documents at issue are privileged.

### Attorney-Client Privilege

"In New York,[4] the attorney-client privilege protects confidential communications between attorney and client relating to legal advice." *Homeward Residential, Inc. v. Sand Canyon Corp.*, 2017 WL 4676806, *5 (S.D.N.Y. 2017). "A determination of whether the

---

[4] Pursuant to Rule 501 of the Federal Rules of Evidence, New York law governs claims of privilege in this diversity action. *See* Fed. R. Evid. 501; *Ceglia v. Zuckerberg*, 2012 WL 1392965, *2 n.4 (W.D.N.Y.) ("[a]s this is a diversity action, insofar as [p]laintiff invokes the attorney-client privilege, the court is required to apply New York law pursuant to Fed. R. Evid. 501"), *aff'd*, 2012 WL 3527935 (W.D.N.Y. 2012).

'privilege exists requires common sense . . . in light of reason and experience,' and should be determined on a 'case-by-case basis.'" *Green v. Beer*, 2010 WL 3422723, *3 (S.D.N.Y. 2010) (quoting *United States v. Adlman*, 68 F.3d 1495, 1500 n.1 (2d Cir. 1995)).  "[T]he privilege is narrowly construed, and the party seeking to invoke it bears the burden of establishing that it applies," *Ravenell v. Avis Budget Grp., Inc.*, 2012 WL 1150450, *1 (E.D.N.Y. 2012), and that it has not been waived, *Egiazaryan v. Zalmayev*, 290 F.R.D. 421, 428 (S.D.N.Y. 2013).  In general, "[s]uch showings must be based on competent evidence, usually through affidavits, deposition testimony, or other admissible evidence," *id.* at 428, and cannot be met by "mere conclusory or ipse dixit assertions," *In re Grand Jury Subpoena Dated Jan. 4, 1984*, 750 F.2d 223, 225 (2d Cir. 1984).

A.    **Agency Exception**

Disclosure of attorney-client communications to persons outside the relationship generally waives the privilege.  *Ravenell v. Avis Budget Grp., Inc.*, 2012 WL 1150450 at *2. Courts have recognized an exception to the waiver doctrine "where communications are made to counsel through a hired interpreter, or one serving as an agent of either attorney or client to facilitate communication."  *Allied Irish Banks v. Bank of America, N.A.*, 240 F.R.D. 96, 103 (S.D.N.Y. 2007) (alterations and quotation marks omitted).  "The scope of this exception is not to be defined by a third party's employment or function, but the party asserting the agency exception must show:  (1) a reasonable expectation of confidentiality under the circumstances, and (2) that disclosure to the third party was necessary for the client to obtain informed legal advice."  *Homeward Residential, Inc. v. Sand Canyon Corp.*, 2017 WL 4676806 at *5 (quotation marks omitted).

With respect to the confidentiality element, "[a] client's subjective belief that an attorney-client communication will remain confidential is ordinarily necessary to sustain the privilege, but a mere expectation alone is not sufficient"; it must also be reasonable. *Nat'l Educ. Training Grp., Inc. v. Skillsoft Corp.*, 1999 WL 378337, *4 (S.D.N.Y. 1999); *see also Ross v. UKI Ltd.*, 2004 WL 67221, *3 (S.D.N.Y. 2004) ("[t]hough a formal agency relationship is not required, the relationship between the client and the third party must be sufficiently close that the client's subjective expectation of confidentiality is reasonable"). With respect to the second element, necessity "means more than just useful and convenient." *Allied Irish Banks v. Bank of America, N.A.*, 240 F.R.D. at 103. Rather, the third party must be "nearly indispensable or serve some specialized purpose in facilitating the attorney-client communications." *Id.* In other words, "where the third party's presence is merely 'useful' but not 'necessary,' the privilege is lost." *Id.* at 104.

Freed Maxick was not Rank's client. Therefore, communications with Freed Maxick disclosing attorney-client advice waived the privilege unless they fell within the agency exception at the time they were made. As an initial matter, I find that Sutherland has adequately demonstrated that its "subjective belief" that Russo and his investigative team would keep confidential the communications with Rank was reasonable under the circumstances. Vellodi declared that he knew Russo "underst[ood] and respect[ed] the need to keep certain matters confidential" and he "had every reason to believe that any communications with Mr. Russo related to Rank Associates' legal advice would remain confidential." (Docket # 59-1 ¶ 10). Furthermore, Russo affirmed that he "kept the communications at issue, involving Rank Associates and Sutherland Global, confidential." (Docket # 59-2 at ¶ 14).

Here, the applicability of the agency exception depends on whether Sutherland has demonstrated that Freed Maxick's involvement in attorney-client communications was "nearly indispensable or serve[d] some specialized purpose in facilitating the attorney-client communications." *See Allied Irish Banks*, 240 F.R.D. at 103. To make that assessment, I address in turn the four categories of documents and communications identified in the logs: (1) those between Rank and Russo; (2) those from Rank to Russo and Sutherland; (3) those from Sutherland to Rank and Russo; and, (4) those from Russo to himself.

1.    **Communications between Rank and Russo**
      **(Docket # 50-7 at 5, 8, items 5, 6, 29)**

Sutherland has submitted no affidavits from any Rank attorneys concerning the nature of Rank's communications with Russo. Russo, on the other hand, has submitted an affidavit averring that he provided and explained information to Rank that was uncovered through Freed Maxick's investigation of the Sutherland Land Acquisition. (Docket # 59-2 at ¶ 12). Russo states that his disclosures and explanations to Rank were necessary to "help guide" Rank's legal advice to Sutherland. (*Id.* at ¶ 13). Vellodi has affirmed that "[b]ecause no [Sutherland] employees were involved in the investigation, and the short time frame involved, absent Mr. Russo and his team gathering and analyzing the underlying facts, [Rank] would not have been able to provide [Sutherland] with competent legal advice with respect to Plaintiff and Ramanan." (Docket # 59-1 at ¶ 9). Stated another way, Russo provided Rank with the facts necessary for Rank to provide legal advice to Sutherland. (*See* Docket # 52 at 6 "Russo and his team at Freed Maxick . . . provided the factual foundation and analysis upon which Rank based its advice").

Based on the record before the Court, I find that Sutherland's assertion of privilege as to these particular communications is unjustified. Sutherland's position is similar to

one rejected by the Second Circuit in *United States v. Ackert*, 169 F.3d 136 (2d Cir. 1999).  In

*Ackert*, counsel for Paramount Corporation ("Paramount") had several conversations with a

third-party investment banker concerning an investment proposal the investment banking firm

had made to Paramount "to learn more about the details of the proposed transaction and its

potential tax consequences, so that he could advise his client . . . about the legal and financial

implications of the transaction."  *United States v. Ackert*, 169 F.3d at 138.  Contending that these

communications were privileged, Paramount asserted that "it was impossible for [its counsel] to

advise [it] without these further contacts with [the banker], because [Paramount's counsel] could

not otherwise fully define the factual, and therefore legal, nature of the proposal."  *Id.* at 139.

The court held that, even assuming that the attorney conversed with the banker "in order to gain

information and to better advise his client," the communications were not privileged.  *Id.*  As the

court reasoned:

> [Paramount's attorney] was not relying on [the banker] to translate
> or interpret information given to [the attorney] by [Paramount];
> [r]ather, [the attorney] sought out [the banker] for information
> Paramount did not have about the proposed transaction and its tax
> consequences.  Because [the banker's] role was not as a translator
> or interpreter of client communications, the [agency exception]
> does not shield his discussions with [Paramount's counsel].

*Id.* at 139-40.  The court emphasized that "a communication between an attorney and a third

party does not become shielded by the attorney-client privilege solely because the

communication proves important to the attorney's ability to represent the client."  *Id.* at 139.

        The reasoning of *Ackert* compels a similar conclusion in this case.  Here, Russo

provided factual information to Rank that Sutherland did not itself possess; although it may have

been helpful or convenient to Rank to speak directly to Russo, the record does not prove that

Rank *needed* Russo to interpret the information for it.  Indeed, Russo testified that Rank did not

provide advice about accounting matters.  (Docket # 46-17 at 3).  Accordingly, I find that the

communications between Russo and Rank are not privileged.  *See Ackert*, 169 F.3d at 139; *see*

*also In re Application Pursuant to 28 U.S.C. Section 1782*, 249 F.R.D. 96, 101-02 (S.D.N.Y.

2008) (finding no privilege where "[a]t best, [third party] may have provided some help to

[attorney] in clarifying certain factual issues surrounding" the underlying dispute).

## 2. **Exchanges from Rank to Russo and Sutherland** **(Docket # 50-7 at 2, items 1, 3, 5; at 5-8, items 7, 9, 10, 11, 12, 13, 14, 16, 17, 18, 20, 22, 23, 24, 28, 33)**

Regarding communications from Rank to Russo and Sutherland, Vellodi proffers

one conclusory statement about Russo's involvement:

> my conferral with Mr. Russo was necessary and indispensable to
> my understanding of [Sutherland's] legal options, as provided by
> [Rank], with respect to . . . how best to address the missing money
> that had allegedly been given by Plaintiff to [Ramanan].

(Docket # 59-1 at ¶ 9).  As an initial matter, a proponent of privilege cannot meet the applicable

burden by "mere conclusory or ipse dixit assertions."  *In re Grand Jury Subpoena Dated Jan. 4,*

*1984*, 750 F.2d at 225.  Second, a review of the privilege log entries suggests that most of these

communications relate to preliminary and final versions of the Report.  Sutherland has offered no

explanation for the purported need to include Rank's legal advice in the Report, the purpose of

which, according to the engagement letter, was to detail Freed Maxick's factual findings

regarding the Sutherland Land Acquisition and to recommend internal controls.  In the absence

of proof to the contrary, I find that the decision to include Rank's legal advice in the Report was

one of convenience, rather than necessity.  *See Allied Irish Banks*, 240 F.R.D. at 104.

Moreover, there is no evidence that Rank's attorneys could not have understood

the Sutherland Land Acquisition or rendered legal advice to Sutherland about its options for

recovering the advanced funds without Freed Maxick's help.  Indeed, Rank, an Indian-based law

firm "specializ[ing] in real estate transactions" (Docket # 59-2 at ¶ 11), was retained by Sutherland to advise on Indian-based real estate transactions. Beyond Vellodi's wholly conclusory assertion, no specific factual showing has been made that Rank or Sutherland required Russo to facilitate the provision of legal advice from Rank to Sutherland. *Cf. United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961) ("[h]ence the presence of an accountant, whether hired by the lawyer or by the client, while the client is relating a complicated tax story to the lawyer, ought not to destroy the privilege, any more than would that of a linguist . . . of [a] foreign language").

In short, the record is devoid of facts to demonstrate that Freed Maxick's involvement was "nearly indispensable or serve[d] some specialized purpose in facilitating attorney-client communications." *Allied Irish Banks*, 240 F.R.D. at 103. Rather, the proof suggests that Freed Maxick's role in attorney-client communications was merely useful and convenient. That alone does not shield the privilege from waiver. *See id.* at 104.

### 3.     Exchanges from Sutherland to Rank and Russo (Docket # 50-7 at 5, item 3)

The privilege logs reflect one communication from Sutherland to Rank and Russo – a December 2, 2013, email from Kumar "concerning legal advice and scope of work to be conducted by lawyers in connection with land transaction." (Docket # 50-7 at 5, item 3). No proof on the record justifies Sutherland's privilege assertion over this communication. Vellodi's declaration addresses only his conferral with Russo, and not the necessity of Russo's involvement in communications from Kumar to Rank. Furthermore, Russo's declaration only addresses his communications with Rank, and does not reference his involvement in communications between Kumar and Rank several months after the issuance of the Report. Accordingly, Sutherland has failed to show that this communication is privileged.

### 4. **Exchanges from Russo to Himself**
### **(Docket # 50-7 at 8, item 32)**

Sutherland also asserts that a spreadsheet Russo emailed to himself is privileged. The log does not reflect that Rank was party to the communication, and the record does not otherwise demonstrate that the spreadsheet reflects privileged communications, let alone how such communications came to be included in the spreadsheet. Without more, Sutherland has not demonstrated that this communication is privileged.

\* \* \*

In sum, on this record, I find that Sutherland has not met its burden of showing that Freed Maxick acted as its agent in any of the communications at issue. As a result, the communications at issue, including the redacted information in the Report, are not privileged under the agency exception.

### B. **Functional Equivalent Doctrine**

Alternatively, Sutherland argues that attorney-client communications shared with Russo are privileged because Russo was the "functional equivalent" of a Sutherland employee. (Docket ## 52 at 13; 59 at 4-6). "Although a number of courts around the country, including several within this Circuit, have adopted [the functional equivalent doctrine], it has never been recognized by the Second Circuit." *See Church & Dwight Co. Inc. v. SPD Swiss Precision Diagnostics, GmbH*, 2014 WL 7238354, \*1 (S.D.N.Y. 2014). Assuming the viability of the doctrine in this Circuit, I nonetheless find that Sutherland has failed to demonstrate that Russo was the functional equivalent of a Sutherland employee.

"[C]ommunications between a company's lawyers and its independent contractor merit [attorney-client privilege] protection if, by virtue of assuming the functions and duties of [a] full-time employee, the contractor is a *de facto* employee of the company." *Exp.-Imp. Bank*

*of the United States v. Asia Pulp & Paper Co., Ltd.*, 232 F.R.D. 103, 113 (S.D.N.Y. 2005). In determining whether a third-party consultant should be considered the functional equivalent of a company's employee, courts evaluate:

> whether the consultant had primary responsibility for a key corporate job, whether there was a continuous and close working relationship between the consultant and the company's principals on matters critical to the company's position in litigation, and whether the consultant is likely to possess information possessed by no one else at the company.

*Id.* (internal citations omitted). The party asserting privilege bears the burden of showing that the third-party consultant "meet[s] this standard of integration into the [company's] corporate structure." *Id.*

Here, the record demonstrates that Sutherland engaged Russo, a Director of Freed Maxick, in August 2013 "to consult with and assist [Sutherland] with providing *outsourced* internal control assessment services." (Docket # 50-1 at 2 (emphasis added)). His role included "gathering and analyzing the underlying facts" of the Sutherland Land Acquisition (Docket # 59-1 at ¶ 9) and "provid[ing] recommendations for improvements to internal controls at [Sutherland]" (Docket # 50-1 at 2), all of which were to be detailed in the Report.

The record also reveals that Russo and his team traveled to India for less than two weeks to conduct the investigation. (Docket ## 60-2 at 2 (stating that Russo and his team were in India for 10 or 12 days in connection with the investigation); 50-2 at 2 ("[Freed Maxick] visited the Chennai, India office and land holdings between August 28 and September 2, 2013 to perform the following procedures.")). According to Sutherland, Russo was "given authority to pursue the investigation as [he] saw fit" (Docket # 59-1 at ¶ 8), and no Sutherland employees were involved in the investigation (Docket ## 59-1 at ¶ 9; 59-2 at ¶ 10). Russo provided the Report on Freed Maxick letterhead to Sutherland in September 2013. (Docket # 50-2). The

Report noted that although Sutherland had retained Freed Maxick to, among other things, "provide a limited general review of internal controls at Sutherland's Indian operations," Sutherland, and not Freed Maxick, was "responsible for the design, implementation and maintenance of internal controls."  (*Id.*).

Sutherland cites several cases in support of its argument that Russo was the functional equivalent of a Sutherland employee.  (Docket # 59 at 5-6).  All are materially distinguishable from this case.  In *In re Copper Market Antitrust Litigation*, 200 F.R.D. 213 (S.D.N.Y. 2001), the defendant, a Japanese company, retained a "crisis management" public relations firm "to handle public relations matters arising from" a dispute that had led to a government investigation and civil litigation.  *In re Copper Mkt. Antitrust Litig.*, 200 F.R.D. at 215.  The company hired the public relations firm because the company "had no prior experience in dealing with issues relating to publicity arising from high profile litigation, and because [the company] lacked experience in dealing with Western media."  *Id.*  The public relations firm worked "largely" out of the company's Tokyo headquarters and acted as the company's "agent and its spokesperson when dealing with the Western press on issues relating to" the dispute.  *Id.*  Working with the company's in-house and outside counsel, the firm prepared internal statements establishing the scope of permitted communications by the company's employees concerning the dispute.  *Id.* at 216.  The firm also made statements on behalf of the company and had the authority to "make decisions on behalf of [the company] concerning its public relations strategy."  *Id.* at 215-16, 219.  In these functions, the firm also sought advice from the company's counsel.  *Id.* at 216.  On this record, the court found:

> [the public relations firm] was the functional equivalent of an
> in-house public relations department with respect to Western
> media relations having authority to make decisions and statements
> on the company's behalf, and seeking and receiving legal advice

> from the company's counsel with respect to the performance of its
> duties.

*Id.* As the court reasoned, the public relations firm was "essentially[ ] incorporated into [the company's] staff to perform a corporate function that was necessary . . . at the time," namely, to make public relations decisions and statements on behalf of the company, recognizing that those statements had the potential to be "used by [the company's] adversaries [against it] in litigation." *Id.* at 216, 219.

In *American Manufacturers Mutual Insurance Company v. Payton Lane Nursing Home, Inc.*, 2008 WL 5231831 (E.D.N.Y. 2008), another case upon which Sutherland relies, the defendant sought production of communications between plaintiffs' counsel and a non-party construction management services company, Greyhawk, N.A. ("Greyhawk"), which plaintiffs had retained "to act as their agent and as their 'eyes and ears' on the construction project at issue." *Am. Mfrs. Mut. Ins. Co. v. Payton Lane Nursing Home, Inc.*, 2008 WL 5231831 at *2. Greyhawk had "the authority to make decisions related to the construction project on [p]laintiffs' behalf" and consulted with and received advice from plaintiffs' counsel. As the court observed, Greyhawk also "likely" possessed information about the construction project "not possessed by anyone else employed by [p]laintiffs." *Id.* at *3. In addition, "Greyhawk's involvement (on [p]laintiffs' behalf) in the negotiation of the various contracts with contractors and subcontractors had clear legal ramifications for [p]laintiffs." *Id.* Based on these considerations, the court found Greyhawk to be the functional equivalent of plaintiffs' employees. *Id.*

Finally, Sutherland relies on *Twentieth Century Fox Film Corporation v. Marvel Enterprises, Inc.*, 2002 WL 31556383 (S.D.N.Y. 2002). There, the documents at issue were disclosed by Twentieth Century Fox Film Corporation ("Fox") to independent contractors, who provided production-related services. *Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*,

2002 WL 31556383 at *1-2. Fox claimed that the documents were protected by the attorney-client privilege because it made an "economic decision to conduct its business through independent contractors as opposed to employees." *Twentieth Century Fox Film Corp.*, 2002 WL 31556383 at *1. The court held that the independent contractors were the functional equivalent of Fox's employees. *Id.* at *2. The court reasoned:

> Fox's determination to conduct its business through the use of independent contractors is a result of the sporadic nature of employment in the motion picture industry . . . . The fact that the nature of the industry dictates the use of independent contractors over employees should not, without more, create greater limitations on the scope of the attorney-client privilege.

*Id.* Here, by contrast, Sutherland has proffered no evidence that it retained Freed Maxick as part of an "economic decision" to conduct business through independent contractors rather than employees. *See id.* at *1-2.

Indeed, the engagement letter makes clear that Sutherland, not Freed Maxick, retained the authority to make decisions on the issues about which Freed Maxick was consulted – a distinction of material significance. *Cf. In re Copper Mkt. Antitrust Litig.*, 200 F.R.D. at 219 ("[the public relations firm] possessed authority to make decisions on behalf of [the company] concerning its public relations strategy[,] [and] [t]he legal ramifications and potential adverse use of such communications were material factors in the development of the communications[;] [i]n formulating communications on [the company's] behalf, [the public relations firm] sought advice from [the company's] counsel and was privy to advice concerning the scandal and attendant litigation"); *Am. Mfrs. Mut. Ins. Co.*, 2008 WL 5231831 at *3 ("[m]oreover, Greyhawk's services in connection with pursuing payment from [the defendant], including articulating positions on behalf of [the plaintiffs], required consultation with and the receipt of legal advice from [p]laintiffs' counsel"). Unlike the cases cited by Sutherland, the record in this case does

18

not demonstrate that Russo (or Freed Maxick) had similar authority.  Rather, Freed Maxick was

engaged to conduct a fact-gathering investigation and to propose *recommendations* concerning

internal controls to Sutherland, not to decide whether to adopt them.  *See*, *e.g.*, *Steinfeld v. IMS

*Health Inc.*, 2011 WL 6179505, *4 (S.D.N.Y. 2011) (finding compensation consultant was not

functional equivalent of defendant's employee; "the evidence presented does not reveal that

[consultant] exercise[d] any measure of independent decision-making authority within

[defendant's] team[;] [i]nstead, it appears that [consultant's] role was to provide suggestions,

comments, and (non-legal) advice").  Indeed, Freed Maxick explicitly represented in the Report

that Sutherland, not Freed Maxick, was "responsible for the design, implementation and

maintenance of internal controls."  (Docket # 50-2 at 2).  Moreover, no evidence exists in the

record that Russo and his team held themselves out to third parties as representatives of

Sutherland or were viewed by others as employees of Sutherland.  *See*, *e.g.*, *Steinfeld v. IMS

*Health Inc.*, 2011 WL 6179505 at *3 ("there is no evidence that [consultant] has ever appeared

on behalf of [defendant], corresponded with third parties as a representative of [defendant], or

has been viewed by others as an employee of [defendant]").

     Nor, on this record, has Sutherland demonstrated that "there was a continuous and

close working relationship" between its principals and Russo's team "on matters critical to

[Sutherland's] position in [anticipated] litigation" at the time of the communications.  *See*

*Exp.-Imp. Bank of the United States v. Asia Pulp & Paper Co., Ltd.*, 232 F.R.D. at 113.

Sutherland argues:

> in addition to Mr. Russo's decades-long relationship with Mr.
> Vellodi and Sutherland Global, including his subsequent
> employment as Legal Director, he was hired to acquire and
> articulate the underlying facts which, ultimately, formed the basis
> of Sutherland Global's litigation strategy against both [p]laintiff
> and Ramanan.

(Docket # 59 at 5). The simple fact that Russo's investigation uncovered and developed facts that were used in this litigation does not prove the existence of that type of relationship. That Russo himself was a Sutherland employee during periods before and after his investigation of the Sutherland Land Acquisition also does not demonstrate that he was "integrat[ed] into [Sutherland's] corporate structure" at the time he learned the attorney-client communications at issue. *See Exp.-Imp. Bank*, 232 F.R.D. at 113. In addition, even if Russo learned factual information about the Sutherland Land Acquisition that no one else at Sutherland knew, that fact alone does not transform Russo into a functional equivalent of a Sutherland employee. *See Homeward Residential, Inc.*, 2017 WL 4676806 at *14 (finding that third-party data storage and management company was not the plaintiff's functional equivalent even if it had information possessed by none of plaintiff's employees; "[b]usinesses routinely rely on other companies to carry out important functions and services, including but not limited to shipping, accounting, customer service, and, as here, data storage and management[;] [i]f this relationship satisfied the functional equivalent standard, the exception could well swallow the rule").

On the record before this Court, I find that Sutherland has not carried its burden of demonstrating that Russo functioned as a *de facto* employee of Sutherland at the time the challenged communications occurred, and I conclude that its assertion of privilege as to those communications is not justified. Because I conclude that the communications are not protected, I need not address whether Sutherland waived any privilege by placing the communications at issue in the litigation.

## <u>CONCLUSION</u>

For these reasons, Narayanan's motion to compel **(Docket # 45)** is **GRANTED**. Sutherland is directed to disclose the unredacted Report and the following communications and documents reflected on the privilege logs:  items 1, 2, 3, and 5 on Sutherland's Privilege and Redaction Log, and items 3, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 16, 17, 18, 20, 22, 23, 24, 28, 29, 32, and 33 on Sutherland's Supplemental Privilege and Redaction Log.  (Docket # 50-7).

**IT IS SO ORDERED**.


_____*s/Marian W. Payson*_____
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
January 25, 2018