UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MUTHU NARAYANAN,

                          Plaintiff,        15-CV-6165 T

          v.                                **DECISION AND ORDER**

SUTHERLAND GLOBAL HOLDINGS, INC.,

                          Defendant.
_____

<u>**INTRODUCTION**</u>

Plaintiff Muthu Narayanan ("Plaintiff") commenced the instant action on March 25, 2015, alleging claims for breach of contract and unjust enrichment against defendant Sutherland Global Holdings, Inc. ("Defendant"), a corporation of which Plaintiff is a former director.  Docket No. 1.  On June 15, 2015, Defendant filed an answer to Plaintiff's complaint in which it asserted a counterclaim for breach of fiduciary duty against Plaintiff.  Docket No. 12.

Currently pending before the Court are a motion for partial summary judgment filed by Defendant (Docket No. 67) and a motion for summary judgment filed by Plaintiff (Docket No. 73).  In particular, Defendant seeks summary judgment in its favor as to Plaintiff's first and second causes of action and as to its counterclaim, while Plaintiff seeks summary judgment in his favor on all claims and counterclaims pending.  For the reasons set forth below, the parties' respective motions are each granted in part and denied in part.

## BACKGROUND

The following facts are taken from the respective statements of fact, affidavits, declarations, and exhibits submitted by the parties.

### I. Relationship Between the Parties and Other Involved Individuals and Entities

#### A. Defendant

Defendant is a Delaware corporation with its headquarters in Rochester, New York. Defendant has approximately 40 direct and indirect subsidiaries, including Sutherland Global Services Pvt. Ltd. ("SGS-India") and Sutherland Development Company Pvt. Ltd. ("SDC"), both of which were formed under Indian law and are headquartered in India. SDC was formed in India in February 2010 and was originally named Sutherland Realties Pvt. Ltd. SDC is directly owned by Sutherland Global Services (Mauritius) Holding Ltd. ("SGS-Mauritius"), which is in turn indirectly owned by Defendant. Dilip Vellodi ("Vellodi") is the founder, controlling shareholder, Chief Executive Officer ("CEO") and Chairman of the Board of Directors (the "Board") of Defendant.

#### B. Plaintiff

Plaintiff, a citizen and resident of India, is a chartered accountant licensed to practice in India and has practiced in that country for 36 years. In or around March 2000, Vellodi engaged Plaintiff to assist in the establishment of SGS-India. On April 1, 2004, SGS-India hired Plaintiff as Vice President - Finance. Plaintiff was subsequently made Senior Vice President - Finance of

SGS-India in 2007.  Plaintiff also served as a member of the Board of Directors of Defendant, SGS-India, SDC, and other subsidiaries of Defendant.  Until October 2014, Plaintiff was Defendant's most senior finance employee in India, and was sometimes referred to as the Chief Financial Officer ("CFO") of Defendant's Asia-Pacific region.

### C. <u>Kamalesh, Ramanan, and RJK Investments</u>

Kamalesh Kumar Sheth ("Kamalesh") is Vellodi's brother-in-law and the business partner of S. Ventkataramanan ("Ramanan"). Kamalesh and Ramanan co-own a land aggregation business, RJK Investments, Inc. ("RJK Investments"). Plaintiff has known Kamalesh since roughly 1979, when Plaintiff provided accounting services to a company called Lalah Spices, where Kamalesh was a partner. Plaintiff first met Ramanan in 2006.  The parties dispute whether Plaintiff introduced Ramanan to Vellodi or Vellodi introduced Plaintiff to Ramanan.  At some point in 2006, Plaintiff introduced Anuradha Sriram ("Sriram") and his wife, Sri Ram Subramanya ("Subramanya") to Kamalesh.  Sriram and Subramanya provided a loan to RJK Investments to fund its land aggregation business.  Through at least February 2017, this loan was not paid back in full, and Plaintiff was in communication with Kamalesh regarding the money owed.  Plaintiff also introduced Siva Ramakrishnan ("Siva") to Kamalesh.  Siva loaned RJK Investments between 20 and 30 million rupees, which had not been paid back by at least October 2014.

In or about 2008, Plaintiff's father and sister loaned eight million rupees to RJK Investments.  RJK Investments required this

money to fund its land aggregation business. Plaintiff's father requested repayment of the loan in full sometime in 2009. Kamalesh informed Plaintiff that RJK Investments' financial situation was "tight" and requested Plaintiff's assistance in repaying the loan from Plaintiff's father. Plaintiff agreed to pay the loan back, and did so at some point in 2009. RJK Investments in turn agreed to pay Plaintiff back the full amount of the loan, plus 12% interest, within six to eight weeks thereafter. However, by January 2016, RJK Investments had repaid Plaintiff only two million rupees.

Also in or about 2009, Plaintiff made a second personal loan of 300,000 rupees to RJK Investments. Kamalesh had informed Plaintiff that RJK Investments was in urgent need of money to make a payment. Plaintiff did not inquire as to whom the loan was needed to pay, and issued the loan without any specific repayment terms. Plaintiff testified at deposition that he anticipated the loan being returned in full within two weeks but, as of February 2017, the loan had not been repaid.

### D. **Freed Maxick**

Freed Maxick CPAs, P.C. ("Freed Maxick") is an accounting firm used by Defendant. In 2014, Mark Russo ("Russo") was a director at Freed Maxick and a member of its executive committee. Russo began performing personal accounting services for Vellodi in the early 1980s and for Defendant's predecessor, Sutherland Global Limited, in 1986. Russo has also been employed by Defendant as its Legal Coordinator since April 2014, but is not a lawyer. As relevant to

this lawsuit, Samuel DiSalvo was the tax director at Freed Maxick and Mark Forte was a staff accountant and supervisor.

## II.  The Stock Option Agreement

On October 21, 2004, pursuant to Defendant's Amended and Restated 2004 Performance Equity Incentive Plan (the "Plan"), Defendant and Plaintiff executed a Senior Management Performance Equity Incentive Plan Stock Option Agreement (the "Stock Option Agreement") which granted Plaintiff the option to purchase 300,000 shares of Defendant's stock (the "Option"). Plaintiff's Option had an expiration date of October 21, 2014, and had fully vested by October 2008. The exercise price for the stock underlying Plaintiff's Option was $1.6840 per share, for a total exercise price of $505,062.00. The Stock Option Agreement provides that in the event Plaintiff is terminated for cause, the Option shall terminate and cease to be exercisable immediately.

## III. The India Land Acquisition

In or about 2009, SGS-India began a project (the "India Land Acquisition") to obtain approximately 26 acres of land in Perumbakkam, a suburb of Chennai, India, to build a campus. In May 2009, in connection with the India Land Acquisition, K.S. Kumar ("Kumar"), Defendant's Chief Commercial Officer, entered into a contract with Ramanan (the "Kumar-Ramanan Contract"). The Kumar-Ramanan Contract authorized the advance of 10 million rupees to Ramanan, and required Ramanan to issue a "post dated cheque" and execute a promissory note for the advance amount. Other than this advance, the Kumar-Ramanan Contract provided that money would be

released to Ramanan only at the time of registration of land. Under the terms of the Kumar-Ramanan Contract, the purchase price of the land was to be 15 million rupees per acre. The Kumar-Ramanan Contract further required that Ramanan complete the registration of property within 120 days of the date of the contract. In contravention of the terms of the Kumar-Ramanan Contract, Kumar approved two advances of 10 million rupees to Ramanan, with the second advance occurring in June 2009. Despite these two advances, Ramanan did not acquire any land from May 2009 until after the formation of SDC in early 2010.

At some point in either 2009 or 2010 (the exact chronology is disputed by the parties), Plaintiff was put in charge of the India Land Acquisition. Defendant also created SDC in February 2010 for the sole purpose of acquiring the 26 acres of land in Perumbakkam. Plaintiff and Vellodi were the initial directors of SDC. SGS-Mauritius funded SDC with 10 million dollars.

At a board meeting on March 1, 2010, SDC's board unanimously resolved that SDC would acquire about 26 acres of land in Perumbakkam for a total estimated cost of about 500 million rupees (which the Court notes equates to roughly 19 million rupees per acre). SDC's board further authorized Plaintiff to negotiate and finalize the terms of the purchase and to engage any necessary agents for procuring the land and entering into sale agreements. Plaintiff was further authorized to execute all necessary documents and deeds and to "do all things in connection there with." Plaintiff maintains that his authority to oversee the India Land

Acquisition derives from resolution of the SDC board and is unrelated to the Kumar-Ramanan Contract, while Defendant contends that Plaintiff continued to operate under the terms of that agreement.

Between 2010 and August 31, 2013, approximately 11 acres of land in Perumbakkam were registered to SDC, at an aggregate cost of 170 million rupees. By August 31, 2013, SDC had also advanced Ramanan approximately 324 million rupees for 16 acres in land sales that had not been completed or registered, as authorized by Plaintiff. In connection with these advances, employees of SGS-India collected promissory notes and undated signed checks from Ramanan in the amounts of money that were advanced. Plaintiff did not investigate whether Ramanan was financially capable of honoring the promissory notes or the undated signed checks. However, Plaintiff maintains that he believed Ramanan was capable of honoring the promissory notes and undated signed checks because Ramanan was in business with Vellodi's brother-in-law and had previously performed land aggregation for Vellodi's personal projects, had been engaged by Kumar to be a land aggregator for the India Land Acquisition, and owned valuable properties, including office spaces, in a prime area.

In July or August 2013, Ramanan was arrested and imprisoned due to his activities on a separate land aggregation project. Plaintiff and Vellodi subsequently had a conversation in which they discussed Ramanan's arrest and the status of the India Land Acquisition. Also in August 2013, Vellodi, on behalf of Defendant,

engaged Freed Maxick to conduct an investigation into the India Land Acquisition.

Russo was the lead Freed Maxick accountant involved in the investigation into the India Land Acquisition. Mike Ervin ("Ervin"), a director at Freed Maxick, and Drew Pond ("Pond"), a manager at Freed Maxick, were also both involved in the investigation. On August 20, 2013, prior to the investigation having been undertaken, Pond circulated a memorandum to Russo and Ervin which included several allegations made by Vellodi against Plaintiff. The memorandum indicates that it has already been concluded that Plaintiff engaged in impropriety - for example, the memorandum states that Russo may have a discussion with Plaintiff because "it is known that [Plaintiff] has done improper things" and Plaintiff is being given "an opportunity to come clean on what happened and how and any other improper acts [Plaintiff] may have committed]." Docket No. 145 at 4. The memorandum further indicates that Defendant "most likely won't terminate [Plaintiff]," but will instead "make [Plaintiff] aware of the fact that they know he has been doing improper things, then keep a close eye on him and make his work life miserable." *Id*. at 3.

On September 6, 2013, Plaintiff drafted a "Land Action Plan" that outlined steps to be taken to complete the India Land Acquisition, and sent it to Russo. The Land Action Plan describes five steps to be taken, and includes taking steps to present the undated signed checks and to collect on the promissory notes if satisfactory progress is not made.

Freed Maxick issued a report on September 12, 2013 regarding the India Land Acquisition (the "Freed Maxick Report"). The Freed Maxick Report concludes that Plaintiff failed to comply with the terms of the Kumar-Ramanan Contract and that "a significant amount [of] Sutherland resources have been disbursed for unapproved items, for which recovery is uncertain." Docket No. 98 at 7. The Freed Maxick Report recommends that SDC considering negotiating a lower per acre price for future purchases with Ramanan, as well as insisting that the price for any future land purchases be reduced by the advances that had already been made. The Freed Maxick Report further advises that SDC consider whether to terminate its agreement with Ramanan.

Also in or about September 2013, Defendant engaged Rank & Associates, an Indian law firm, to provide legal advice regarding the India Land Acquisition. Plaintiff never refused to provide documents or to attend any meetings that he was asked to attend regarding the India Land Acquisition. Plaintiff also arranged for Rank & Associates to meet with Ramanan. In November 2013, Plaintiff, Ramanan, Russo, and an attorney from Rank & Associates attended a meeting to discuss steps to take to complete the India Land Acquisition.

Plaintiff, Vellodi, and Kumar signed an SDC "Internal Memorandum on Land Acquisition" (the "Internal Memo") dated November 13, 2013. The Internal Memo indicates that the price of land in Perumbakkam had significantly increased, such that the approximately 11 acres of land held by SDC was then worth

440 million rupees. The Internal Memo further indicated that, after discussions with Ramanan, Kumar had recommended that SDC attempt to acquire land in Karunillam, a different village in southern India. Kumar was authorized to oversee the acquisition of land in Karunillam. The land was to be acquired using the advances already provided to Ramanan. Ramanan subsequently provided SDC with eight mortgage deeds for land in Karunillam, totaling 10.19 acres. The mortgage deeds were registered between December 2013 and December 2014 and SDC has the ability to enforce the mortgages at any time, such that it can either take full title of the land securing the mortgages or sell the land and retain the proceeds up to the amount of the mortgages. As of November 25, 2015, the mortgages had an approximate value of 385,300,000 rupees, which exceeds the amount that SDC advanced to Ramanan.

## IV. **The 2014 Option Exercise Program**

In the fall of 2014, Defendant and TPG Capital entered into a transaction whereby TPG acquired a roughly 30% stake in Defendant for $342,587,651.78 (the "TPG Transaction"). In connection with the TPG Transaction, Defendant offered certain of its optionholders the opportunity to participate in a program described as the Sutherland Global Holding, Inc. Option Exercise and Stock Buy-back Program (the "Option Exercise Program"). The Option Exercise Program was open to "service providers" (defined as employees, directors, or consultants of Defendant and any of its subsidiaries) who (i) had options granted in 2004, 2005, 2006, or 2007, or (ii) had options granted in 2008, 2009, 2010, 2011, or 2012 and had

been employed by Defendant since September 30, 2004. Essentially all participants in the Option Exercise Program were to be permitted to sell 30% of the shares resulting from the net exercise[1] of their stock options back to Defendant.

The parties dispute who was responsible for administering the Option Exercise Program. Defendant notes that its Amended and Restated 2004 Performance Equity Incentive Plan (the "Plan"), under which Plaintiff's Option was granted, provides that the Plan shall be administered by the board, unless and until authority is delegated to a committee. However, Plaintiff contends that, in practice, Freed Maxick administered the Option Exercise Program. Plaintiff further argues that no authorization from the administrator of the Plan was required for Defendant to agree to purchase 100% of his shares.

On October 7, 2014, DiSalvo, on behalf of Defendant, sent Plaintiff all the documents necessary for him to exercise his Option. The cover letter accompanying these documents explained that Plaintiff was being given the opportunity to exercise his Option and to subsequently have Defendant purchase 30% of the shares resulting from his net exercise. The cover letter further explained that Plaintiff was required to sign the documents

---

[1] A "net exercise" occurs when the person who exercises an option is permitted to surrender to the company a number of shares equal in value to the exercise price and the withholding tax liability, rather than paying those sums in cash.

included in the package on or before October 9, 2014. One of the enclosed documents was the Net Exercise and Share Sale Agreement (the "30% Net Exercise Agreement"), which sets forth the terms on which Plaintiff was permitted to exercise his Option and sell back shares to Defendant.

DiSalvo testified at his deposition that an optionholder was deemed to have successfully exercised his or her option when DiSalvo received all the required signatures. Plaintiff submitted all the signature pages required to exercise his Option to DiSalvo on October 9, 2014, with a copy to Russo, Forte, and Satish Raman ("Raman"), Defendant's Corporate Secretary. Raman countersigned the documents on behalf of Defendant on October 9, 2014. As a result of exercising his Option in a net exercise, Plaintiff received 169,356 shares of Defendants' stock, and surrendered 130,644 shares to Defendant to cover the exercise price and the tax withholding. Pursuant to the terms of the Option Exercise Program, Defendant had agreed to purchase 30% (50,807) of Plaintiff's shares upon the closing of the TPG Transaction. The purchase price for those shares was to be $590,885.41 (50,807 shares at $11.63 per share).

Plaintiff testified at his deposition that at or about the beginning of October 2014, he informed Russo that he was experiencing health issues and requested that Russo tell Vellodi that Plaintiff wanted to sell back 100% of his shares, rather than

30%. Plaintiff states that Russo told him he would speak to Vellodi about this request and that Plaintiff shouldn't worry about it. Vellodi acknowledged at his deposition that Russo had communicated Plaintiff's request to him, but denied having agreed to it.

On October 21, 2014, Forte emailed Plaintiff, enclosing several documents for Plaintiff's signature. Forte's email stated in relevant part that the documents were being sent "in regards to the Company buying back 100% of [Plaintiff's] shares" and requested that Plaintiff sign and return them "as soon as possible." One of the enclosed documents was entitled Net Exercise and Share Sale Election (the "100% Net Exercise Amendment") and provided that Plaintiff would sell all 169,356 of his shares to Defendant. Plaintiff signed and returned the documents to Forte on October 22, 2014, with copies to DiSalvo, Russo, and Raman. Neither Plaintiff nor Defendant has ever produced a copy of these documents countersigned by Defendant. Had Plaintiff sold 100% of his shares to Defendant, the price would have been $1,912.164.72 (169,356 shares at $11.63 per share).

## V.  __The Redemption Agreement__

Separate and apart from the 300,000 shares underlying Plaintiff's Option, Plaintiff also owned 1000 shares of Defendant's common stock. On October 22, 2014, Plaintiff and Defendant entered into an agreement under which Plaintiff would sell these additional

1000 shares to Defendant (the "Redemption Agreement"). Under the terms of the Redemption Agreement, Defendant was to purchase the additional shares at a price of $11.2908 per share, for a total purchase price of $11,290.80. The purchase was to close when the TPG Transaction closed. Nothing in the Redemption Agreement requires that Plaintiff be in good standing or have any role whatsoever with Defendant in order for the purchase to close.

## VI. Closing of the TPG Transaction and Defendant's Failure to Pay

The TPG Transaction closed on October 23, 2014. Defendant did not subsequently pay Plaintiff the amounts due to him under any of the 30% Net Exercise Agreement, the purported 100% Net Exercise Amendment, or the Redemption Agreement. However, on November 7, 2014, Defendant paid 62,050,651 rupees (roughly $1 million at the then-current exchange rate) of withholding tax to the Indian government with regard to Plaintiff's wage gain resulting from the net exercise of his Option. In August 2015, after Plaintiff commenced the instant action, Defendant petitioned the Indian taxing authority to reverse that withholding tax payment.

## VII. Termination of the Parties' Relationship and Indian Legal Proceedings

The parties dispute the circumstances under which Plaintiff's relationship with Defendant ended. Defendant contends that Vellodi terminated Plaintiff as a director and employee on October 18, 2014. However, the documentary evidence establishes that Plaintiff

remained a director until October 23, 2014, at which point he resigned.  In particular, the Court notes that there was never any corporate resolution or determination of Defendant's board of directors removing Plaintiff as a director; that Plaintiff's email account with Defendant continued to be active even after October 2014; that between October 18, 2014 and October 23, 2014 Plaintiff continued to act in his capacity as a director including by providing necessary signatures at the request of Defendant's employees; and that Plaintiff (at Defendant's request) signed the documents necessary to close the TPG Transaction in his capacity as a director of Defendant.  Moreover, Russo (in his capacity as Defendant's Legal Coordinator) signed a letter dated November 18, 2014 that states that "[Defendant] acknowledges that [Plaintiff's] employment with the Company ceased effective October 23, 2014." Docket No. 73-72 at 9.  On that same day, Russo sent an email to an employee of SGS-India indicating that Plaintiff had stepped down from his position with Defendant effective October 23, 2014. SDC's Directors Report for 2013-2014 also indicates that Plaintiff resigned from the board (not that he was terminated) and SDC's board passed a resolution on November 24, 2014 that accepted Plaintiff's resignation "with effect from October 23, 2014." Docket No. 73-76 at 2.  It is further undisputed that Defendant requested in November 2014 that Plaintiff continue to perform various services for Defendant, including handling some of

Defendant's bank accounts and acting as a signatory for various entities associated with Defendant.

On or about September 12, 2015, SDC filed a criminal complaint against Plaintiff, Kamalesh, and Ramanan in Chennai, India. On September 28, 2015, the Indian court granted Plaintiff's application for bail. The criminal complaint against Plaintiff apparently remains outstanding.

In June and September 2016, Defendant initiated civil legal action against Ramanan in India. The parties have not provided the Court with any information regarding the status or outcome of these legal proceedings.

## VIII.    Procedural History

Plaintiff commenced the instant action on March 25, 2015. Docket No. 1. Plaintiff's complaint alleges four causes of action: (1) breach of contract as to Defendant's failure to pay him for the proceeds of his sale of shares in connection with the Option Exercise Program; (2) unjust enrichment as to the same; (3) breach of contract as to Defendant's failure to pay him the proceeds of the Redemption Agreement; and (4) unjust enrichment as to the same.

Defendant filed its answer and counterclaim on June 2, 2015 (Docket No. 12), and on July 24, 2015, Plaintiff moved to dismiss the counterclaim and to strike Defendant's second affirmative defense (Docket No. 20). The Court denied Plaintiff's motion on

November 23, 2015.  Docket No. 37.  The parties thereafter engaged
in extensive discovery.

Defendant filed its motion for partial summary judgment on
November 14, 2017.  Docket No. 67.  In particular, Defendant seeks
judgment in its favor with respect to Plaintiff's first and second
causes of action and with respect to its counterclaim for breach of
fiduciary duty.  Plaintiff also filed his motion for summary
judgment on November 14, 2017, seeking judgment in his favor as to
all claims and counterclaims pending in this action.  Initial
briefing on the pending motions was completed on February 2, 2018.

During the pendency of the instant actions, Magistrate Judge
Marian W. Payson entered a Decision and Order granting a motion to
compel filed by Plaintiff.  Docket No. 91.  Plaintiff subsequently
requested that the parties be permitted to file additional briefing
based on the documents produced in response to Judge Payson's
Decision and Order.  The Court granted Plaintiff's request, and a
second round of briefing occurred.  The second round of briefing
was completed on April 6, 2018.

## DISCUSSION

### I.  Standard of Review

Pursuant to Rule 56(a) of the Federal Rules of Civil
Procedure, the Court will grant summary judgment if the moving
party demonstrates that there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter of

law.  When considering a motion for summary judgment, all genuinely disputed facts must be resolved in favor of the party against whom summary judgment is sought. *See Tolan v. Cotton*, 134 S.Ct. 1861, 1863 (2014).  If, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party, a grant of summary judgment is appropriate.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007), citing *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986).

## II.   The Court Has Disregarded the Declaration of Shiva Shankar

As a threshold matter, the Court notes that, in connection with his motion for summary judgment, Plaintiff submitted a declaration dated November 11, 2017, and signed by Shiva Shankar ("Shankar"), an attorney licensed to practice law in Chennai, India.  Docket No. 76 (the "Shankar Declaration").  Defendant argues that the Shankar Declaration must be disregarded because (1) Plaintiff failed to comply with Federal Rule of Civil Procedure 44.1, which requires any party who intends to raise an issue concerning the law of a foreign country to provide written notice, whether by the pleadings or otherwise, and (2) Plaintiff failed to identify Shankar as an expert witness or provide an expert report as required by the Federal Rules of Civil Procedure and the case management order.  The Court agrees that Plaintiff failed to comply with the Federal Rules of Civil Procedure's expert disclosure

requirements with respect to the Shankar Declaration and has accordingly disregarded it in deciding the instant motions.

"[A] party is entitled to discovery regarding its adversary's foreign law expert, just as it is entitled to discovery regarding any other kind of expert." *Silberman v. Innovation Luggage, Inc.*, No. 01 CIV. 7109 GELDF, 2002 WL 31175226, at *2 (S.D.N.Y. Sept. 30, 2002). Where a party, without explanation, submits an affidavit from a previously undisclosed expert witness in connection with a motion for summary judgment, it is appropriate for the Court to disregard that affidavit. *See Smith v. Target Corp.*, No. 1:10-CV-1457 MAD/CFH, 2012 WL 5876599, at *8 (N.D.N.Y. Nov. 20, 2012).

Here, Shankar purports to act as an expert witness. Indeed, he states in his declaration that he has been asked to provide his "professional opinion regarding matters of Indian law." Docket No. 76 at ¶ 3. Plaintiff's failure to comply with the disclosure requirements for expert witnesses or to provide any explanation for why it did not previously disclose Shankar precludes any reliance on the Shankar Declaration, and therefore it has not been considered by the Court in deciding the instant motions.

### III. **Plaintiff is Entitled to Summary Judgment on Defendant's Breach of Fiduciary Duty Counterclaim**

Because the parties' arguments related to Plaintiff's breach of contract claims turn in significant part on the resolution of Defendant's breach of fiduciary duty counterclaim, the Court will

consider the breach of fiduciary duty counterclaim first.  In its counterclaim, Defendant alleges that Plaintiff breached his duty of loyalty to Defendant because, in connection with the India Land Acquisition, he "did not act consistent with his authorization and in the best interests of [Defendant]," but instead "diverted [Defendant's] money for his personal benefit and then made repeated misrepresentations regarding the true nature of those transactions in order to conceal his conduct."  Docket No. 12 at ¶¶ 101-102. Defendant further alleges that Plaintiff failed to provide "his full cooperation in good faith to collect the Missing Funds he improperly exchanged for . . . promissory notes" in connection with the SDC Land Acquisition, and that Defendant has been damaged, "at a minimum, by the fact that it now possesses unenforceable promissory notes rather than land deeds."  *Id.* at ¶¶ 103-104.

Defendant now seeks summary judgment in its favor on its counterclaim, arguing that: (1) Plaintiff's "financial entanglement" with Ramanan and RJK investments represented a conflict of interest that breached his duty of loyalty to Defendant; (2) Plaintiff breached his "duty of candor" by failing to disclose his financial ties to Ramanan and RJK Investments to Defendant's board of directors, as well as by failing to disclose "all of the information needed to determine how the [India] Land Acquisition was proceeding"; and (3) Plaintiff breached his duty of

loyalty to Defendant by failing to run its subsidiaries in Defendant's best interest.   Docket No. 72 at 18-23.

## A.   **Choice of Law**

The Court has jurisdiction over the instant matter based on the parties' diversity of citizenship and as such, the substantive law of New York applies.  *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 417 (2010) ("It is a long-recognized principle that federal courts sitting in diversity apply state substantive law and federal procedural law.") (internal quotation omitted).  This includes New York's choice of law rules. *See Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 710 (2d Cir. 2002).  "Under New York law, issues relating to the internal affairs of a corporation are decided in accordance with the law of the state of incorporation. . . .  Consistent with the internal affairs doctrine, a claim of breach of fiduciary duty owed to a corporation is governed by the law of the state of incorporation." *BBS Norwalk One, Inc. v. Raccolta, Inc.*, 60 F. Supp. 2d 123, 129 (S.D.N.Y. 1999), *aff'd*, 205 F.3d 1321 (2d Cir. 2000).  Defendant was incorporated in Delaware, and as such, Delaware law governs its claim against Plaintiff for breach of fiduciary duty.

Despite having applied Delaware law in both its memorandum of law in support of its motion for summary judgment as to its counterclaim (*see* Docket No. 72) and in opposition to Plaintiff's motion for summary judgment as to that same counterclaim (*see*

Docket 88), Defendant contends in its reply papers that "Delaware law . . . is inapplicable" because "SDC is an Indian Corporation." Docket No. 99 at 7. In addition to being inconsistent with Defendant's prior submissions, this argument lacks merit. SDC is not a party to this action. Defendant has expressly contended that Plaintiff breach his fiduciary duties "to *Sutherland Global*" (Docket No. 72 at 30) (emphasis added), not to SDC. *See also* Docket No. 12 at ¶ 100 (Defendant's counterclaim is premised on the fact that Plaintiff was a director of Defendant and owed Defendant fiduciary duties). Moreover, and as Defendant correctly stated in its own submissions, "'[t]he fiduciary duties owed by directors of a wholly[-]owned subsidar[y] run only to the parent.'" Docket No. 88 at 19 (quoting *Hamilton Partners, L.P. v. Englard*, 11 A.3d 1180, 1208 (Del. Ch. 2010)). Defendant has therefore failed to show that Delaware law should not apply to its counterclaim against Plaintiff.

B. **Delaware Law Regarding Duty of Loyalty**

"Directors of a Delaware corporation owe two fiduciary duties — care and loyalty. The duty of loyalty includes a requirement to act in good faith, which is a subsidiary element, *i.e.*, a condition, of the fundamental duty of loyalty." *In re Orchard Enterprises, Inc. Stockholder Litig.*, 88 A.3d 1, 32–33 (Del. Ch. 2014) (internal quotation omitted). "Essentially, the duty of loyalty mandates that the best interest of the corporation and its

shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993), *decision modified on reargument*, 636 A.2d 956 (Del. 1994).

"When determining whether corporate fiduciaries have breached their duties, Delaware corporate law distinguishes between the standard of conduct and the standard of review. The standard of conduct describes what directors are expected to do and is defined by the content of the duties of loyalty and care. The standard of review is the test that a court applies when evaluating whether directors have met the standard of conduct." *Chen v. Howard-Anderson*, 87 A.3d 648, 666 (Del. Ch. 2014) (internal quotation omitted). "Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness." *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del.Ch.2011). "Which standard of review applies will depend initially on whether the board members (i) were disinterested and independent (the business judgment rule), (ii) faced potential conflicts of interest because of the decisional dynamics present in particular recurring and recognizable situations (enhanced scrutiny), or (iii) confronted actual conflicts of interest such that the directors making the

decision did not comprise a disinterested and independent board majority (entire fairness)." *Chen*, 87 A.3d at 666-67.

## C. The Business Judgment Rule Applies

In assessing Defendant's counterclaim against Plaintiff, the Court must first determine the applicable standard of review. Plaintiff contends that his actions should be judged in accordance with the business judgment rule, while Defendant contends that entire fairness review is appropriate, because Plaintiff had an actual conflict of interest in the India Land Acquisition project, and because the business judgment rule does not apply to conduct by individual directors as opposed to decisions made by the board.

For the reasons set forth at length below, the Court finds that the business judgment rule is applicable to Plaintiff's decision-making with respect to the India Land Acquisition Project. On the current record, no rational factfinder could conclude that Plaintiff engaged in self-dealing or was otherwise so interested in the success of RJK Investments that his independence was compromised.

### i. The Business Judgment Rule is not *Per Se* Inapplicable

As a threshold matter, Defendant contends that the business judgment rule does not apply to actions taken by individual directors, as opposed to actions taken by the board of directors as a whole. Defendant's argument misapprehends the scope of the business judgment rule. Delaware courts have not hesitated to

apply the business judgment rule where a board of directors has delegated a specific function to a smaller group of members. *See, e.g., In re MFW Shareholders Litig.*, 67 A.3d 496, 518 (Del. Ch. 2013), *aff'd sub nom. Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014) (business judgment rule applied to actions of special committee in assessing proposed transaction). Moreover, Delaware courts have applied the business judgment rule in determining whether the actions of individuals have violated their duty of loyalty. *See, e.g., In re Walt Disney Co. Derivative Litig.,* 907 A.2d 693, 757 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006) (applying business judgment rule in determining that president of corporation did not breach duty of loyalty when he accepted a non-fault termination package). In this case, the board of SDC indisputably delegated to Plaintiff the authority to oversee the India Land Acquisition, to negotiate and finalize the terms of the purchase, and to engage any necessary agents for procuring the land and entering into sale agreements. Accordingly, the Court finds that the business judgment rule is not, as Defendant contends, *per se* inapplicable in this case.

### ii. <u>Plaintiff did not Engage in Self-Dealing</u>

Turning to the issue of Plaintiff's alleged conflicts of interest, Defendant contends that (1) Defendant was an "investor" in RJK Industries and, as such, his advancement of funds to Ramanan in connection with the India Land Acquisition amounted to self-

dealing; and (2) Defendant's relationship with RJK Investments and Ramanan "left him hopelessly compromised" and he therefore "lacked independence." Docket No. 88 at 31. These contentions are unsupported by the record.

Under Delaware law, "[a] director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders." *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993). With respect to the specific claim of self-dealing, "[t]raditionally, the term 'self-dealing' describes the situation when a [corporate fiduciary] is on both sides of a transaction." *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1169 (Del. 1995) (internal quotation omitted). Self-dealing occurs "when a director deals directly with the corporation, or has a stake in or is an officer or director of a firm that deals with the corporation." *Id*.

In this case, Plaintiff did not deal directly with Defendant in connection with the India Land Acquisition, nor was he an officer or director of any firm dealing with Defendant. Moreover, his position as a creditor of RJK Investments does not equate to having a stake in a firm doing business with Defendant. No rational factfinder could conclude on the record before the Court that RJK Investments was a party to any transaction involved in the India Land Acquisition. To the contrary, the Kumar-Ramanan Contract was entered into by Ramanan personally. *See* Docket No. 70-15.

Moreover, Defendant's own documents confirm that Ramanan individually served as the land aggregator for the India Land Acquisition and that the advances made by SDC in connection with that project were made to Ramanan individually. *See, e.g.,* Docket Nos. 70-17 at 12-14, 17, 70-19 at 3, 5, 10. Ramanan also individually executed the promissory notes and checks collected as security for the advances. *See* Docket No. 73-126. The parties have presented no evidence that SDC ever advanced funds to RJK Investments or entered into a contract or agreement with that entity. Accordingly, no rational factfinder could conclude that RJK Investments (the entity in which Defendant contends Plaintiff has a stake) was doing business with SDC or Defendant in connection with the India Land Acquisition.

Based on the foregoing, Defendant's argument that Plaintiff engaged in self-dealing would require a factfinder to conclude that Plaintiff's status as a creditor to an entity partially owned by Ramanan but uninvolved in the India Land Acquisition somehow imbued Plaintiff with a personal stake in the outcome of the India Land Acquisition. That conclusion is unsupported by the evidence or by the relevant case law. *See Orman v. Cullman*, 794 A.2d 5, 26 (Del. Ch. 2002) (stating that "[t]he law in Delaware is well-settled" that "longstanding business relations" do not establish "interest and/or lack of independence"); *State of Wisconsin Inv. Bd. v. Bartlett*, No. C.A. 17727, 2000 WL 238026, at *6 (Del. Ch. Feb. 24,

2000) (evidence of personal or business relationship "does not raise an inference of self-interest"). Moreover, Defendant acknowledged in a letter to its auditor in November 2015 that it did not have any knowledge regarding the disposition of the funds advanced to Ramaman, including specifically whether those funds had been provided to Plaintiff. Defendant has also not presented any evidence in support of its motion or in opposition to Plaintiff's motion that Plaintiff financially benefitted from the advances made to Ramanan. Defendant's sole argument in this regard is that RJK Investments paid back some (but not all) of the money it owed to Plaintiff and that the money for this repayment may have come from the advances made to Ramanan. This is nothing more than speculation. There is no evidence in the record regarding RJK Investments other sources of funding, nor has Defendant demonstrated that Ramanan turned over the advances (which were made to him individually) to RJK Investments. The Court therefore finds that Defendant cannot establish that Plaintiff engaged in self-dealing.

### iii. **Plaintiff's Independence was not Compromised**

Defendant has also argued that Plaintiff's personal and business relationship with Ramanan compromised his independence. However, this allegation is also unsupported by the record and inconsistent with Delaware law, under which:

> there is a presumption that directors are independent. To show that a director is not independent, a plaintiff must

demonstrate that the director is 'beholden' to the controlling party or so under [the controller's] influence that [the director's] discretion would be sterilized. [Delaware] law is clear that mere allegations that directors are friendly with, travel in the same social circles, or have past business relationships with the proponent of a transaction or the person they are investigating, are not enough to rebut the presumption of independence.

*In re MFW Shareholders Litig.*, 67 A.3d at 509; *see also In re W. Nat. Corp. Shareholders Litig.*, No. 15927, 2000 WL 710192, at *12 (Del. Ch. May 22, 2000) (director's "close social and professional ties" with interested parties insufficient to call into question independence). Moreover, "a plaintiff seeking to show that a director was not independent must meet a materiality standard, under which the court must conclude that the director in question's material ties to the person whose proposal or actions she is evaluating are sufficiently substantial that she cannot objectively fulfill her fiduciary duties." *In re MFW Shareholders Litig.*, 67 A.3d at 509. Importantly, "the simple fact that there are some financial ties between the interested party and the director is not disqualifying." *Id*. Delaware law further requires that, to determine materiality, the Court "look to the financial circumstances of the director in question." *Id*.

In this case, no rational factfinder could conclude that Plaintiff's relationship with Ramanan was sufficient to rebut the presumption of Plaintiff's independence. There is no evidence that Plaintiff and Ramanan had the kind of close, personal relationship

that Delaware courts have found may be disqualifying.  To the
contrary, the evidence shows that Plaintiff and Ramanan were
business acquaintances.  Plaintiff further contends, and Defendant
has no evidence to contradict, that he loaned money to RJK
Investments at the request not of Ramanan, but of Kamalesh, whom
Plaintiff had known for many years and who was Vellodi's brother-
in-law.  Defendant acknowledges that Vellodi had previously used
Kamalesh and Ramanan as land aggregators in his personal
transactions.

Defendant also cannot demonstrate that the loans Plaintiff
made to RJK Investments were material to Plaintiff.  RJK
Investments owes Plaintiff just under eight million rupees, which
is the equivalent of roughly $120,000 at the current exchange rate.
Plaintiff has represented, and Defendant has produced no evidence
to rebut, that this amount of money is not material to his net
worth or his cash position.  A party moving for summary judgment
may meet its burden "by demonstrating to the Court that there is an
absence of evidence to support the nonmoving party's case on which
that party would have the burden of proof at trial."  *Vergara v.
Bentsen*, 868 F. Supp. 581, 588 (S.D.N.Y. 1994).  In this case,
because Defendant would have the burden of showing at trial that
the loans made by Plaintiff were material to his economic position,
and because Plaintiff has established that Defendant has no
evidence to support this contention, Plaintiff has met his burden

of showing that his independence was not compromised by his financial ties to RJK Investments or Ramanan. *See In re MFW Shareholders Litig.*, 67 A.3d at 509 (directors' receipt of fees between $100,000 and $200,000 from interested parties did not compromise independence where there was no evidence of materiality).

### iv. <u>Plaintiff did not Breach the Duty of Candor</u>

Defendant has also argued that Plaintiff violated his duty of candor (which Delaware courts also sometimes refer to as the "duty of disclosure") to his fellow directors in connection with the India Land Acquisition. The Court finds that no rational factfinder could reach such a conclusion on the instant record.

Under Delaware law, "[t]he duty of disclosure is not an independent duty, but derives from the duties of care and loyalty. Corporate fiduciaries can breach their duty of disclosure . . . by making a materially false statement, by omitting a material fact, or by making a partial disclosure that is materially misleading." *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009) (internal quotations omitted). The duty of candor "dictates that fiduciaries, corporate or otherwise, may not use superior information or knowledge to mislead others in the performance of their own fiduciary obligations." *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1283 (Del. 1989). However, the "duty to disclose is not a general duty to disclose everything the

director knows about transactions in which the corporation is involved. Rather, the director disclosure cases decided in Delaware courts have implicated circumstances in which the director is personally engaged in transactions harmful to the corporation, but beneficial to the director." *Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*, 922 A.2d 1169, 1184 (Del. Ch. 2006).

Here, Defendant cannot demonstrate that Plaintiff violated the duty of candor. In support of its motion for summary judgment on its counterclaim, Defendant identifies the following facts that Plaintiff allegedly failed to disclose to the other members of the board: (1) funds were being advanced to Ramanan without land being registered; (2) Plaintiff had procured promissory notes and signed undated checks from Ramanan as security for the advances made to Ramanan; (3) Plaintiff had not investigated Ramanan's ability to honor the promissory notes and the signed undated checks; (4) Plaintiff had recruited individuals to loan money to RJK Investments; (5) Plaintiff's sister and father had loaned money to RJK Investments; (6) Plaintiff paid back the loan to his father and sister and thereby became a creditor of RJK Investments; (7) Plaintiff made another loan to RJK Investments of 300,000 rupees; (8) Plaintiff was aware of the contents of RJK Investments' tax returns; (9) Plaintiff knew that RJK Investments and Ramanan were having financial difficulties; and (10) Plaintiff did not know what Ramanan was doing with the advances from SDC.

The Court finds as an initial matter that Defendant has failed to demonstrate that the majority of the facts allegedly withheld by Plaintiff are material. A fact is material only if there is a "substantial likelihood that under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable [individual]." *Gradient OC Master, Ltd. v. NBC Universal, Inc.*, 930 A.2d 104, 128 (Del. Ch. 2007). In this case, the majority of the facts allegedly withheld by Plaintiff have nothing whatsoever to do with the India Land Acquisition. As discussed above, RJK Investments was not a party to the India Land Acquisition, and there is therefore no basis to conclude that the details of Plaintiff's financial relationship with RJK Investments was in any way material to the challenged transactions (namely, the advances to Ramanan). The Court further notes that it was Kumar and not Plaintiff that initially engaged Ramanan as the land aggregator in connection with the India Land Acquisition, and that Vellodi had previously engaged Ramanan as a land aggregator in connection with his personal transactions. Accordingly, Defendant cannot show a substantial likelihood that a reasonable member of the board would have considered Plaintiff's prior interactions with Ramanan and RJK Investments material.

Moreover, with respect to the few allegedly withheld facts that do relate to the India Land Transaction, these amount to

nothing more than a disagreement with the manner in which Plaintiff carried out his authority. However, internal disagreements about allocation of resources do not amount to a violation of the duty of candor. *See OptimisCorp v. Waite*, No. CV 8773-VCP, 2015 WL 5147038, at *62 (Del. Ch. Aug. 26, 2015), aff'd, 137 A.3d 970 (Del. 2016).

Additionally, the documentary record contradicts any assertion that Plaintiff attempted to conceal the manner in which the India Land Transaction was proceeding. Plaintiff undisputedly provided SDC's audited financial statements to Defendant for fiscal years 2011 to 2014. These financial statements show the advances that were made to Ramanan, as well as the amounts expended for land purchased. *See, e.g.,* Docket No. 73-114 at 12-13 (financial statement for fiscal year 2012 showing approximately 320 million rupees as "Capital Advances - Purchase of Land" and showing value of freehold land held by SDC and change from previous year). The notes to the audited financial statements specifically stated that advances for the purchase of land have been paid to a third party to whom the acquisition of land from individual small landowners has been outsourced. Vellodi signed the audited financial statements for fiscal years 2012 and 2013 showing that there had been no increase in the land owned by SDC. In order to show a lack of candor (disclosure) that rose to the level of breach of the duty of loyalty, Defendant must show that Plaintiff acted "in bad faith,

knowingly or intentionally." *Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 987 (Del. Ch. 2000) (internal quotation omitted). No rational factfinder could find such bad faith or knowing deceit here, because Plaintiff made available to Defendant the information Defendant claims was not disclosed. As such, the Court finds that Defendant cannot show that Plaintiff breached the duty of candor, and therefore cannot show that the business judgment rule is inapplicable on this basis.

### D. Plaintiff's Actions in Connection with the India Land Acquisition Satisfy the Business Judgment Rule

Having determined for the reasons discussed above that the business judgment rules applies to SDC's advancement of funds to Ramanan in connection with the India Land Acquisition, the Court next considers whether Plaintiff can nonetheless establish a breach of fiduciary duty. The Court finds that no rational factfinder could conclude that Plaintiff's actions failed to satisfy the business judgment rule.

The business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company. Absent an abuse of discretion, that judgment will be respected by the courts. The burden is on the party challenging the decision to establish facts rebutting the presumption." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) (internal citations omitted)*, overruled on other*

*grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). Pursuant to the business judgment rule, "[c]ourts do not measure, weigh or quantify directors' judgments" and "do not even decide if they are reasonable." *Brehm*, 746 A.2d at 264. Instead, "[i]rrationality is the outer limit of the business judgment rule. Irrationality may be the functional equivalent of the waste test or it may tend to show that the decision is not made in good faith, which is a key ingredient of the business judgment rule." *Id*. at 264-65. "Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task." *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005).

In this case, Plaintiff's actions with respect to the India Land Acquisition do not rise to the level of irrationality. As discussed above, there is no evidence that Plaintiff's actions with respect to the India Land Acquisition were undertaken in bad faith. To the contrary, the record shows that Plaintiff attempted to achieve Defendant's goal of obtaining 26 acres of land in Perumbakkam, and in fact succeeded in obtaining roughly 11 acres of such land, the value of which substantially increased over time. There is no evidence that Plaintiff diverted or misappropriated any of the funds advanced to Ramanan for Plaintiff's own use, and Plaintiff provided to Defendant audited financial statements that showed the advances made and the land acquired.

Additionally, and as set forth in the Court's recitation of the facts relevant to the instant motions, the evidence of record demonstrates that SDC (and, in turn, Defendant) was not ultimately financially harmed as a result of the India Land Acquisition project. The roughly 11 acres of land that SDC acquired in Perumbakkam increased in value by roughly sixty percent from when they were purchased in 2010 and 2011 to 2015. Moreover, the promissory notes that SDC obtained from Ramanan are secured and collateralized by eight mortgage deeds of land totaling 10.19 acres in Karunillam. The face amount of these mortgages, which SDC has the ability to enforce at any time, exceeds the balance of the funds advanced to Ramanan. Accordingly, Defendant cannot show that Plaintiff's actions were the equivalent of corporate waste, which occurs only where an "exchange was so one sided that no business person of ordinary, sound judgment would conclude that the corporation has received adequate consideration." *Freedman v. Adams*, 58 A.3d 414, 417 (Del. 2013) (internal quotation omitted).

For all the foregoing reasons, the Court concludes that, on the record before it, no rational factfinder could conclude that Plaintiff breached his fiduciary duties to Defendant. As such, the Court grants Plaintiff's motion for summary judgment as to Defendant's counterclaim and denies Defendant's motion for summary judgment as to the same.

## IV. **Plaintiff's Breach of Contract and Unjust Enrichment Claims**

Having determined that Plaintiff is entitled to summary judgment on Defendant's breach of fiduciary duty counterclaim, the Court finds that Defendant's argument that it is entitled to a complete set-off to the moneys claimed by Plaintiff (*see* Docket No. 12 at ¶ 59) is without merit. Accordingly, the Court next considers whether Plaintiff is entitled to summary judgment on his claims for breach of contract or unjust enrichment.

### A. **Choice of Law**

As set forth above, because the Court's jurisdiction in this case is based on the parties' diversity of citizenship, New York's choice of law rules govern. "New York law is clear in cases involving a contract with an express choice-of-law provision: Absent fraud or violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction." *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000).

Here, the Stock Option Agreement expressly provides that "[t]he validity and enforceability of this Stock Option Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to otherwise governing principles of conflicts of law." Docket No. 73-21 at ¶ 8. Similarly, the 30% Net Exercise Agreement provides that it "shall

be governed by and construed in accordance with the laws of the State of New York." Docket No. 73-20 at 24. The Redemption Agreement also provides that it "shall be governed by and construed in accordance with the internal Laws of the State of New York." Docket No. 73-66 at ¶ 12(b). There is no suggestion in the record or any of the parties' submissions that these choice of law provisions were the result of fraud, and these contracts have sufficient contacts with New York to warrant application of New York law, inasmuch as Defendant's headquarters are located in this state. As such, to the extent Plaintiff's claims involve the interpretation or enforcement of any of the Stock Option Agreement, the 30% Net Exercise Agreement, or the Redemption Agreement, they are governed by New York law.

With respect to whether or not the 100% Net Exercise Agreement is a validly formed contract, Plaintiff's arguments are based on New York law (*see* Docket No. 78 at 33-40), while Defendant relies upon the laws of Delaware (*see* Docket 72 at 15-22). To resolve this conflict, the Court looks to New York law. "In New York, . . . the first question to resolve in determining whether to undertake a choice of law analysis is whether there is an actual conflict of laws." *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998). If there is "no actual conflict," then the Court will "dispense with a choice of law analysis" and apply New York law. *Id.* Here, the Court finds that there is no relevant conflict in

New York and Delaware law regarding contract formation. "Like Delaware, New York follows traditional contract law principles." *In re IBP, Inc. Shareholders Litig.*, 789 A.2d 14, 54 (Del. Ch. 2001). Under Delaware law, "a valid contract exists when (1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010). Similarly, under New York law, "contract formation requires an objective meeting of the minds regarding the material terms thereof." *O'Brien v. Argo Partners, Inc.*, 736 F. Supp. 2d 528, 534 (E.D.N.Y. 2010). Moreover, Defendant concedes in its reply brief that there are no "material differences between Delaware and New York law" as to this issue. *See* Docket No. 99 at 2 n.2. Because the Court does not find that an actual conflict exists, the Court will apply the law of New York is assessing whether the 100% Net Exercise Amendment is a valid and binding contract.

### B. Plaintiff is Entitled to Summary Judgment on his Claim for Breach of the Redemption Agreement

Because it is a more straightforward claim, the Court determines first that a rational factfinder could not find in Defendant's favor on Plaintiff's claim for breach of the Redemption Agreement. "Under New York law, the elements of a cause of action for breach of contract are (1) the existence of a contract; (2) performance of the contract by one party; (3) breach by the

other party; and (4) damages suffered as a result of the breach." *Transcience Corp. v. Big Time Toys, LLC*, 50 F. Supp. 3d 441, 450 (S.D.N.Y. 2014). In this case, Defendant concedes that it entered into the Redemption Agreement on October 22, 2014 and that the Redemption Agreement provided that, upon the closing of the TPG Transaction, Defendant would repurchase 1000 shares of Defendant's common stock from Plaintiff. Defendant further concedes that nothing in the Redemption Agreement requires Plaintiff that have any role with Defendant or otherwise be in good standing to effectuate the sale. Finally, Defendant concedes that, despite the closing of the TPG Transaction and repeated demands by Plaintiff, it has refused to pay him the proceeds of the sale contemplated by the Redemption Agreement.

In opposition to Plaintiff's motion for summary judgment, Defendant has failed to offer any substantive argument with respect to its failure to honor the Redemption Agreement. To the extent that Defendant contends that it is entitled to set off the amount owed to Plaintiff pursuant to the Redemption Agreement, as set forth above, the Court's resolution of Defendant's counterclaim forecloses that argument. Accordingly, the Court finds that Plaintiff is entitled to summary judgment on his favor with respect to his claim for breach of the Redemption Agreement.

**C.** **Plaintiff is Entitled to Summary Judgment as to his Claim that Defendant Breach the 30% Net Exercise Agreement**

The Court next considers whether Plaintiff has established that a rational factfinder would be compelled to conclude that Defendant violated the 30% Net Exercise Agreement. Again, the Court finds that Plaintiff has adequately established his entitlement to summary judgment on this point.

As set forth above, to prove a breach of contract claim under New York, Plaintiff is required to show "(1) the existence of a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages suffered as a result of the breach." *Transcience Corp.*, 50 F. Supp. 3d at 450. Here, Plaintiff has easily met this standard. It is undisputed that the 30% Net Exercise Agreement (and all other necessary associated documentation) was fully executed by both Plaintiff and Defendant. It is equally clear from the record that despite full performance by Plaintiff under the terms of that agreement, Defendant has refused to fulfill its end of the bargain, thereby damaging Plaintiff.

In its answer to Plaintiff's complaint, Defendant raised several defenses related to its breach of the 30% Net Exercise Agreement. In particular, Defendant asserted that (1) any money it owed to Plaintiff was subject to a set-off due to Plaintiff's alleged breach of fiduciary duty, (2) Plaintiff abandoned his

obligations to Defendant without notice or justification in or around July 2014, which was "tantamount to a for cause termination," and thereby rendered his Option non-exercisable, and (3) Plaintiff "withdrew" his exercise of the Option. With respect to the issue of set-off, as the Court has previously explained, that defense is foreclosed by the Court's grant of summary judgment to Plaintiff on Defendant's counterclaim.

Turning to Defendant's other defenses, Defendant has not supported these arguments in opposition to Plaintiff's motion for summary judgment. With respect to Defendant's abandonment defense, the record simply does not support the conclusion that Plaintiff abandoned his duties to Defendant in July 2014. To the contrary, it is clear from the record that Plaintiff continued to work throughout the summer and fall of 2014, including by being actively involved in attempts to salvage the India Land Acquisition after Ramanan's arrest. Defendant has failed to identify any evidence from which a rational factfinder could conclude that Plaintiff's actions in 2014 were the equivalent of a "termination for cause," a phrase that is very specifically defined in the Plan.

With respect to Defendant's final defense, Defendant acknowledges in its response to Plaintiff's motion that this defense is "no longer relevant." Docket No. 88 at 10, n.3. The Court agrees, because no rational factfinder could conclude on the current record that Plaintiff ever "withdrew" his exercise of his

Option.   To the contrary, the record is clear that Plaintiff exercised his Option on October 9, 2014 and that his subsequent communications with Defendant related not to the fact of the exercise but to what percentage of his shares were to be sold back. The fact that Defendant paid withholding tax to the Indian taxing authority with respect to Plaintiff's exercise of his Option is confirmation that Defendant also did not understand Plaintiff to have withdrawn his Option exercise.

For the foregoing reasons, the Court finds that Plaintiff has established that no reasonable factfinder could find in Defendant's favor with respect to Plaintiff's claim for breach of the 30% Net Exercise Agreement.   As such, Plaintiff's motion is granted and Defendant's motion is denied with respect to that claim.

        **D.**    **Defendant is Entitled to Summary Judgment as to Plaintiff's Claim that it Breached the 100% Net Exercise Amendment**

The final substantive claim the Court must consider is Plaintiff's claim for breach of the 100% Net Exercise Amendment. The threshold and determinative issue in considering this claim is whether a rational factfinder could conclude that the 100% Net Exercise Amendment was a valid contract.   For the reasons set forth below, the Court holds that a rational factfinder could not reach such a conclusion and that judgment in Defendant's favor as to this claim is therefore warranted.

As set forth above, under New York law, "contract formation requires an objective meeting of the minds regarding the material terms thereof." *O'Brien,* 736 F. Supp. 2d at 534. In this case, Plaintiff has failed to show that the 100% Net Exercise Amendment is a valid contract because he cannot show that anyone with the authority to bind Defendant ever agreed to its terms. In particular, the Court finds that, under the express terms of the parties' agreements, Defendant's Board had the sole authority to authorize the 100% Net Exercise Amendment and that there is no evidence it ever did so.

The Plan expressly provides that it shall be administered by the Board. It further provides that the administrator (*i.e.* the Board) "*in its sole discretion* may provide that the Company may repurchase Shares acquired upon exercise of an Option. . . ." Docket No. 70-2 at 10 (emphasis added). The Stock Option Agreement makes it clear that Plaintiff has been granted his Option "pursuant to [the] Plan." Docket No. 73-21 at 2. Moreover, the 30% Net Exercise Agreement states that the Plan is "incorporated by reference and made a part" of the 30% Net Exercise Agreement and that Plaintiff "acknowledges and agrees that the Shares delivered pursuant to the exercise hereunder are subject to the provisions of . . . the Plan." Docket No. 73-30 at 21. The plain language of the parties' agreements therefore compels the conclusion that any

repurchase of Plaintiff's shares was in the sole discretion of the Board and required its authorization.

Plaintiff argues extensively that Freed Maxick was the entity that administered the Option Exercise Program and that, as a result, it had the authority to approve the 100% Net Exercise Amendment. This argument lacks merit. Plaintiff conflates the administration of the Option Exercise Program (*i.e.* the performance of the various administrative tasks associated with organizing, distributing and collecting the various agreements between Defendant and its optionholders) and administration of the Plan (*i.e.* determination of the terms and conditions on which previously granted Options could be exercised). There is no evidence in the record that the Board ever delegated its authority under the Plan to Freed Maxick, nor could it have done so. The Plan provides that such authority may be delegated only to a committee made up of "one or more members of the Board." Docket No. 70-2 at 1.

Plaintiff also contends that Russo agreed to modify the 20% Net Exercise Agreement and thereby bound Defendant to the 100% Net Exercise Amendment. As a threshold matter, this contention lacks support in the record. Plaintiff's own testimony makes it clear that he did not understand Russo to have the authority to ratify the 100% Net Exercise Agreement on Defendant's behalf. Indeed, Plaintiff acknowledged that he asked Russo to take his request to Vellodi and that Russo told him he would speak to Vellodi about it.

These actions are wholly inconsistent with any understanding that Russo had the authority to agree to a 100% buyback. Moreover, and as with Freed Maxick, there is no evidence that Defendant's Board ever delegated to Russo the authority to unilaterally modify the terms and conditions of Plaintiff's exercise of his Option and the subsequent buyback of his shares by Defendant.

Plaintiff further claims that Russo told him that Vellodi had approved the sale of 100% of Plaintiff's shares to Defendant. However, even crediting this statement as true, Plaintiff has failed to demonstrate that Vellodi individually (as opposed to the Board) had the authority to approve such a transaction. As discussed above, nothing in the record before the Court supports the conclusion that Defendant's Board ever delegated the authority reserved to it under the unambiguous terms of the Plan to any other individuals or entities.

Plaintiff's claimed perception that Vellodi, Russo, and/or Freed Maxick had the authority to bind Defendant to the 100% Net Exercise Amendment fails to establish the existence of a genuine issue of material fact. Under New York law, to establish that an agent had the apparent authority (as opposed to actual authority) to engage in a transaction, a party "must establish two facts: (1) the principal was responsible for the appearance of authority in the agent to conduct the transaction in question, and (2) the third party reasonably relied on the representations of the agent."

*Herbert Const. Co. v. Cont'l Ins. Co.*, 931 F.2d 989, 993–94 (2d Cir. 1991) (internal citations and quotations).  Here, Plaintiff cannot establish either of these facts.  As to the first element, Plaintiff admits that he never spoke directly to Vellodi or any other member of the Board regarding his request to sell back 100% of his shares.  It is axiomatic that the Board cannot have created the impression of agency where it had no communications with Plaintiff regarding the transaction at issue.

As to the second element, the record does not support the conclusion that any of Vellodi, Russo, or Freed Maxick ever represented to Plaintiff that they had the authority to authorize a 100% buyback.  With respect to Vellodi, as noted above, Plaintiff acknowledges that he never discussed his request that Defendant buy 100% of his shares with Vellodi.  Turning to Russo, as also previously noted, Russo's statements to Plaintiff that he would take Plaintiff's request to Vellodi are inconsistent with any finding that Russo claimed to have the authority to approve a modification to the 30% Net Exercise Agreement.  Finally, with respect to Freed Maxick, its role in the Option Exercise Program was ministerial, and none of its communications with Plaintiff suggest that it has the authority to modify the terms of any agreement between Plaintiff and Defendant.  Moreover, Plaintiff was a director of Defendant and an accountant, and was familiar with the terms of the parties' agreements; a sophisticated and

knowledgeable individual such as Plaintiff should have been aware that the Board had not made a delegation of its authority under the Plan. As such, no reasonable factfinder could conclude that Vellodi, Russo, or Freed Maxick had the apparent authority to bind Defendant with respect to the 100% Net Exercise Amendment.

Plaintiff's inability to demonstrate that anyone with the authority to do so ever agreed that Defendant would buy 100% of his shares upon the closing of the TPG Transaction is fatal to his claim for breach of the 100% Net Exercise Amendment. Accordingly, the Court finds that judgment in Defendant's favor with respect to this claim is warranted.

### E. Defendant is Entitled to Summary Judgment on Plaintiff's Unjust Enrichment Claims

In addition to his claims for breach of contract, Plaintiff has also asserted two claims for unjust enrichment. The Court finds that Defendant is entitled to summary judgment as to each of these claims.

"The basic elements of an unjust enrichment claim in New York require proof that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004). "The theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates in the absence of any agreement." *Beth Israel Med. Ctr. v. Horizon Blue*

*Cross & Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 586 (2d Cir.
2006). "As the New York Court of Appeals put it, '[t]he existence
of a valid and enforceable written contract governing a particular
subject matter ordinarily precludes recovery in quasi contract for
events arising out of the same subject matter.'" *Digizip.com, Inc.
v. Verizon Servs. Corp.*, 139 F. Supp. 3d 670, 682 (S.D.N.Y. 2015)
(quoting *Clark-Fitzpatrick, Inc. v. Long Is. R.R. Co.*, 70 N.Y.2d
382, 388 (1987)).

In this case, the subject matter of Plaintiff's complaint is
governed by multiple valid and enforceable written contracts,
including the Stock Option Agreement, the 30% Net Exercise
Agreement, and the Redemption Agreement. As such, Plaintiff cannot
maintain his unjust enrichment claims, and Defendant is entitled to
summary judgment in its favor.

### V.   **Damages**

Having found that Plaintiff has established his entitlement to
summary judgment with respect to his claims for breach of the
Redemption Agreement and for breach of the 30% Net Exercise
Agreement, the Court must determine what damages Plaintiff has
established. Under New York law, a party who prevails on a breach
of contract claim may recover "all the direct and proximate damages
which result from the violation." *Nat'l Mkt. Share, Inc. v.
Sterling Nat. Bank*, 392 F.3d 520, 525 (2d Cir. 2004) (internal
quotation omitted). "Where the alleged breach of contract consists

only of a failure to pay money, remedy for the breach is limited to the principal owed plus damages in the form of interest at the prevailing legal rate." *Tevdorachvili v. Chase Manhattan Bank*, 103 F. Supp. 2d 632, 641 (E.D.N.Y. 2000) (internal quotation omitted).

With respect to the issue of interest, "in diversity actions, the awarding of prejudgment interest is considered a substantive issue and is, therefore, governed by state law." *Wechsler v. Hunt Health Sys., Ltd.*, 330 F. Supp. 2d 383, 434 (S.D.N.Y. 2004). Under New York law, "[i]n an action at law [for breach of contract], prejudgment interest is recoverable as of right." *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 342 (2d Cir. 1993). "New York's prejudgment interest rate for breach of contract cases is 9% per annum, which accrues on a simple, rather than a compound, basis." *Wechsler*, 330 F. Supp. 2d at 434-35; *see also* N.Y. C.P.L.R. § 5004 ("Interest shall be at the rate of nine per centum per annum, except where otherwise provided by statute.").

Here, Plaintiff's damages consist of $590,885.41 for breach of the 30% Net Exercise Agreement and $11,290.80 for breach of the Redemption Agreement. The Court therefore finds that Plaintiff is entitled to judgment in the amount of $602,176.21, plus interest at the rate of 9% per annum from October 23, 2014 (the date the TPG Transaction closed and Plaintiff was to be paid).

## CONCLUSION

For the reasons set forth above, the Court grants in part and denies in part Defendant's motion for partial summary judgment (Docket No. 67) and grants in part and denies in part Plaintiff's motion for summary judgment (Docket No. 73). In particular, it is hereby

**ORDERED** that Plaintiff is granted summary judgment with respect to his claims for breach of the Redemption Agreement and breach of the 30% Net Exercise Agreement and with respect to Defendant's breach of fiduciary duty counterclaim; and it is further

**ORDERED** that Defendant is granted summary judgment with respect to Plaintiff's claims for breach of the 100% Net Exercise Amendment and for unjust enrichment; and it is further

**ORDERED** that judgment shall be entered in favor of Plaintiff in the amount of $602,176.21, with prejudgment interest at a rate of 9% per annum from October 23, 2014; and it is further

**ORDERED** that the Clerk of the Court shall close this case.

**ALL OF THE ABOVE IS SO ORDERED.**

S/Michael A. Telesca
_____
     MICHAEL A. TELESCA
United States District Judge

DATED:     Rochester, New York
           May 16, 2018